(No. 32398.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EARL F. HALL, Plaintiff in Error.

*Opinion filed January 22, 1953.*

A. LEWIS HULL, of Decatur, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, A. ZOLA GROVES, and JOHN T. COBURN, of counsel,) for the People.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

The plaintiff in error, Earl F. Hall, hereinafter called petitioner, comes to this court by writ of error to the circuit court of Macon County, to review the judgment of that court on a post-conviction hearing finding the issues in favor of the respondent there, remanding petitioner to the penitentiary, and denying his petition for a rehearing.

The pertinent facts as set out by the petitioner are as follows: On the night of September 13, 1946, plaintiff in error, Earl Hall, and his wife, Ruth Hall, his codefendant in the trial court, were seated in a downtown tavern located in the same block with a hotel in which they were living. One John Rainwater came to their booth at the invitation of one Edwards, who was also seated with them. Rainwater joined the party at about 11:45 P.M., fifteen minutes

before the tavern closing time. Rainwater, a man 76 years old, suggested going to the hotel to have a few drinks. Dan R. Moore, manager of the hotel, testified that Earl Hall called the hotel by telephone about 11:30 to reserve a room for the father of plaintiff in error and his wife. Moore testified that when Hall, Rainwater, and Hall's wife arrived at the hotel plaintiff in error registered the names of the party as "Mr. and Mrs. Earl Hall and father." Rainwater testified that at the time he was in the tavern he had about $300 in his billfold. Rainwater was assigned to one room and the plaintiff in error and his wife were assigned to another room. The three had a few drinks of whiskey together in one of the rooms. Hall left the room long enough to go to a nearby restaurant for sandwiches and later went after two bottles of coke. After Hall returned to the room, the three people walked out of the hotel at about 12:30 A.M. and went to the Illinois Central depot where they each had a sandwich. Rainwater testified that he walked from the tavern to the hotel, that he "never passed out," and walked out of the hotel again, walking down the stairs and through the lobby. He testified further that he took money out of his pocket to pay for the sandwich at the Illinois Central depot and then got into a taxicab and went home alone and that he did not miss his billfold until the next morning. The last time that he remembered having his billfold was in the tavern while drinking, prior to meeting Hall and Hall's wife.

Moore, the hotel manager, testified that Hall paid $20 on account, in advance, the next morning and that about two weeks later, when Mrs. Hall moved out, her clothes were taken out of the room and locked in a closet before she left the hotel.

On November 6, 1946, at about 5:15 in the evening, Hall and his wife were arrested by two Decatur police officers, without a warrant. Nothing was said to them as to the reason for their being arrested. Their personal property was taken away and they were locked in cells of the

city jail. At about 6:30 Hall was removed from his cell and taken into officer Smith's room where he was questioned relative to his activities on September 13. Hall and his wife were denied the use of a telephone and were not permitted to contact a lawyer although both made repeated requests for these privileges. A warrant for Hall's arrest was issued on November 7, 1946. He was brought before a magistrate on November 13. His preliminary hearing was had on November 29 and he was bound over to the grand jury.

During the time that Hall's wife had been held incommunicado, two police officers and an assistant State's Attorney are supposed to have taken a statement from her. Police officer Smith testified that, during the questioning, a conversation between Mrs. Hall, Elizabeth Jones, a stenographer, and officer Smith was taken down by Miss Jones in shorthand. The unsigned, incriminating statement was introduced in evidence at plaintiff in error's trial. The portions of the statement wherein plaintiff in error's name appeared were deleted. Mrs. Hall denied that the statement, as read to the jury, was a true and correct statement of everything that was said in the room that evening. The statement as transcribed and introduced at the trial contained the statement that Mrs. Hall had taken the money in question, which was repudiated and denied by her at the trial.

Hall and his wife were indicted and jointly tried on two counts, larceny from the person and grand larceny. Both defendants were represented at the trial by court-appointed counsel. The plaintiff in error was found guilty of larceny from the person and judgment was entered on March 20, 1947, sentencing him to the Illinois State Penitentiary for a term of one to ten years' imprisonment.

The petitioner's allegations of denial of Federal and State constitutional rights are (1) the admission of the alleged coerced, unsigned statement of his codefendant

taken while both were illegally detained; (2) that he was denied the right to counsel; (3) that counsel appointed to defend him was incompetent; and (4) perjury and subornation of perjury by the prosecuting attorney.

A complete transcript of the record of the trial which resulted in petitioner's conviction was not before the lower court at this post-conviction hearing, but the petitioner offered, and the court admitted in evidence, the common-law record, excerpts of the testimony of some of the witnesses who testified at that original trial, and all affidavits offered by petitioner. The State stipulated as to the correctness of the testimony excerpts. Petitioner also called as witnesses his mother and himself. The State called as witnesses the assistant State's Attorney who assisted in the prosecution and one of the defense attorneys who represented petitioner in the original trial.

The excerpts of the testimony show that at petitioner's original trial Rainwater testified as to his meeting and accompanying petitioner and his wife to the hotel for some drinks, that he had his billfold when he went to the hotel but did not have it the following morning, and that he next saw it in the possession of the police officers. The hotel manager testified that petitioner and his wife were living at the hotel, that petitioner called by phone for a reservation for his father, and petitioner later registered Rainwater as his father; that his hotel register had an entry on that date "Mr. and Mrs. Earl Hall and father" and that petitioner wrote the entry; that petitioner paid $20 in advance on his account the following morning and left the hotel. One of the police officers testified, in substance, that they arrested petitioner and his wife about 5:30 P.M. on November 6, 1946; that they questioned them several times that evening, again on November 7 and 8; that petitioner admitted receiving the money; that petitioner and his wife were not permitted to see anyone or call an attorney any time during the three days. Elizabeth Jones testified she

was a stenographer employed by the then State's Attorney, that she took and transcribed the statement of petitioner's wife, that it was voluntarily given on the evening of November 8, 1946, in the presence of the questioning assistant State's Attorney, the two police officers and herself.

This statement was admitted into evidence after the name of petitioner wherever it appeared therein was deleted. The statement related their trip to the hotel for some drinks and that she took $300 from Rainwater's trousers pocket while her husband was out of the room; that she was willing to make a statement but would not sign it.

Petitioner's wife testified that Rainwater did accompany them to the hotel, registered himself, and had some drinks in their room. She denied taking the money and denied making the incriminating remarks contained in the statement. She testified she and petitioner were held incommunicado and she was threatened with a blackjack and rubber hose by one of the police officers. Petitioner did not testify in his original trial.

At his post-conviction hearing, (the instant appeal,) petitioner testified essentially as set out in his statement of facts recited above, denied knowing anything about the money, stated that he and his wife were held incommunicago for 89 hours and were questioned repeatedly, and stated that he did not think he or his wife made the incriminating statements charged to them but that he was worn out from repeated interrogation and could not positively deny them. Petitioner introduced in evidence an affidavit of his wife which reiterated her testimony given at the original trial regarding her mistreatment by the police officers and again denying that she made the statement or any other incriminating admissions. Petitioner's mother testified that she went to the jail on November 9 and was denied seeing her son; that at petitioner's trial she heard the stenographer ask the State's Attorney where she was supposed to have taken petitioner's wife's statement—"in

the police station?" and the State's Attorney replied, "Yes"; that she was present at the trial and wanted to testify but petitioner's attorney refused to call her; that she paid petitioner's attorneys some money and she thought they were to file a bill of exceptions.

The respondent in the instant hearing called two witnesses, one of the attorneys who represented defendant at his trial and a then assistant State's Attorney who assisted in the prosecution. Petitioner's attorney testified he was appointed to represent him and another was appointed to represent the wife. That after the guilty verdict they filed and argued a motion for a new trial and attempted to make arrangements for petitioner to appeal to this court but petitioner never paid the sum agreed upon for the costs and fees. He further stated that he did not refuse to call any witness requested by the petitioner and that he did not call the two witnesses regarding the alleged perjury because, in the judgment of both defense counsel, it would not have been advisable. The assistant State's Attorney testified that he assisted in the prosecution, that in his opinion the petitioner and his wife were ably and competently represented and that at the conclusion of the case the trial judge congratulated and praised defendants' counsel for their able presentation of the case.

Petitioner's allegations that (2) he was denied the right to counsel, (3) that counsel appointed to defend him was incompetent and (4) that perjury and subornation of perjury were used against him are not established by this record. The petitioner has the burden of showing that he was deprived of a substantial constitutional right in the trial resulting in his conviction. The record shows he was represented by counsel and we do not see wherein his counsel was incompetent or that perjury was suborned. The remarks attributed to the State's Attorney and his stenographer are certainly too indefinite and meaningless to show perjury, and the use of the witnesses in an attempt to cast

an accusation of perjury upon them might well have reacted adversely to the defendants,—in any event the use of such testimony would have to be determined by the judgment of counsel there at the time with knowledge of all surrounding circumstances. Even had they been in error in their judgment, which does not necessarily appear, that would not be incompetence as considered under the constitutional guarantee of competent counsel. There being no constitutional guarantee of the right to appellate review, failure of defendant's counsel to present a bill of exceptions or perfect an appeal because defendant failed to procure the necessary costs is no evidence of incompetence.

Petitioner contends (1) that a confession taken from his codefendant, held incommunicado for 89 hours, in violation of an Illinois statute which requires one arrested without a warrant to be taken before a magistrate "without unnecessary delay," and allegedly coerced, was not admissible, with his name deleted therefrom in their joint trial, and its admission denied him due process of law guaranteed him by the fourteenth amendment to the constitution of the United States.

Before discussing the legal aspects of this problem we should determine the factual question in regard to "coercion." Petitioner's wife testified that a blackjack and rubber hose were exhibited to her and she was asked if she had ever been beaten by the police. This was denied by the officer. The proof at the original trial and at the post-conviction hearing that any force was used by the officers or any threats made to petitioner's wife is purely gossamer. Moreover, this evidence was heard by the jury who found the confession voluntary, and there is nothing in this record to justify us in questioning that jury's findings on this question. The question of "coercion" for our consideration here is only as to detention and questioning.

Petitioner contends that under the authority of the holdings in *McNabb* v. *United States*, 318 U.S. 332, 63

S. Ct. 608, *Upshaw* v. *United States*, 335 U.S. 410, 69 S. Ct. 170, *United States* v. *Ragen*, 176 Fed. 2d 579, and *Gallegos* v. *State of Nebraska*, 342 U.S. 55, 72 S. Ct. 141, illegal detention, in violation of a State statute providing for commitment "without unnecessary delay," is a violation of the fourteenth amendment to the Federal constitution and a confession obtained thereby is a denial of due process, which is inadmissible for any purpose.

The State contends that the *McNabb* rule is a rule of Federal procedure only and not a principle of constitutional law, as clearly stated in the *Upshaw case,* but even if Mrs. Hall's confession was obtained in violation of her constitutional rights, its admission would violate no constitutional right of petitioner when his name had been deleted from the statement. *Malinski* v. *People of State of New York,* 324 U.S. 401, 65 S. Ct. 781.

It is true, as contended by the State, that both the *McNabb* and *Upshaw cases* state that their decisions are not based on constitutional grounds binding on State courts. But it is also true that considerable controversy exists as to what the holding of the *McNabb case* is. Is it the rule of the *McNabb case* that, *as a matter of law,* illegal detention for questioning makes a confession inadmissible, (see dissent of Mr. Justice Jackson in *Ashcraft* v. *Tennessee,* 322 U.S. 143, 64 St. Ct. 921,) or is it rather that illegal detention for questioning constitutes psychological coercion? (*United States* v. *Mitchell,* 322 U.S. 65, 64 S. Ct. 896.) In any event illegal detention for questioning by police officers is a circumstance to be considered as to the voluntary character of the confession, so each case must be considered with its attendant circumstances, to determine if there has been a violation of due process of law.

Prior to the *McNabb* rule, the question of due process was determined by the voluntary or involuntary character of the confession. By this test the confessor had ample protection of his constitutional rights, and we find no rea-

soning in the *McNabb* or *Upshaw* decisions to justify a departure from that test. (See Mr. Justice Reed's dissenting opinion in the *Upshaw case.*) A voluntary confession by a competent person of the guilt of a crime is the highest type of evidence—an involuntary confession obtained by brutality or coercion is wholly unreliable and is the most flagrant violation of the principles of freedom and justice. The decisions of this court have always been guided by these principles and until some sound reasoning appears showing a better test for the admissability of confessions we shall adhere to those principles.

The question then becomes one of fact to be determined from all the circumstances. Illegal detention for questioning is a circumstance to be considered and one that should be given great weight. Police officers should not be encouraged to violate the law in order to enforce it, and they will not be permitted to resort to coercion to avoid honest and competent investigations. But the courts, too, must enforce the law against confessed criminals so long as that may be done without encroaching upon the fundamental principles of freedom and justice. Questioning suspects is indispensable in law enforcement. Coercion and force are wrong, *per se;* questioning is not.

The effect of detention and questioning in coercing a confession, it seems to us, would vary in every instance, depending upon the place and length of time, the manner and extent of the questioning, and primarily upon the individual being questioned. Age, education, experience and emotional characteristics could make questioning coercive in one case, innocuous in another.

In the instant case the confessor was admittedly held for the purpose of questioning. She was held in the local police station in close proximity to her husband, except when taken from her cell to be questioned, and between the questioning periods she could talk with her husband. She was being held and questioned by officers whom she

apparently knew, one of whom she called "Smitty." The evidence fails to show that she was mistreated in any manner other than being detained in a cell which might have been uncomfortable. She was a mature woman 41 years old, and there is no contention or indication that she was illiterate, ignorant, uneducated or uninformed. The emotional effect of the detention and questioning upon her is amply demonstrated by her testimony that when the officers asked her to sign the statement she said "I'm not signing a damn thing." Under these circumstances the illegal detention and questioning did not constitute coercion.

Petitioner's contention that this statement was involuntary was presented to the jury, the jury heard the evidence and found that the statement was voluntary. That constitutes due process of law.

We have held that the confession of a codefendant from which another defendant's name has been deleted is admissible in their joint trial. (*People v. Skelly*, 409 Ill. 613, 621.) It necessarily follows that the petitioner here was not deprived of due process or equal protection of the law.

Petitioner in this appeal alleges and argues but one error by the trial court in his post-conviction hearing, *i.e.,* that the trial court erred in considering excerpts from the transcript rather than a complete transcript of the proceedings at the original trial in determining the question of the competency of his court-appointed counsel. He contends that this court has held that the competency or incompetency of defendant's counsel cannot be determined in the absence of such full transcript, and cites *People v. Gulley*, 411 Ill. 228, and *People v. Carter*, 391 Ill. 594. How the decisions in these cases can have the remotest relevancy to a post-conviction hearing before a trial court is not pointed out and is beyond the reach of our imagination. Each of the cases cited involved a review by this court on writ of error on the common-law record alone. Obviously, the

common-law record alone would not indicate the competency or incompetency of the defendant's counsel. But the trial judge, in a post-conviction hearing, is not confined to an examination of the common-law record as this court is on such review. The Post-Conviction Hearing Act authorizes a petitioner to prove his allegations of denial of a constitutional right "by affidavits, depositions, oral testimony, or other evidence." (Ill. Rev. Stat. 1951, chap. 38, par. 831.) Is not this provision broad enough to permit petitioner to show, not only anything which might appear in the transcript, but anything that might have occurred before, during or after his trial?

If there were other circumstances indicating incompetence in addition to those specified by petitioner, it was incumbent upon him to bring them to the attention of the court in the manner provided by the statute.

The judgment of the trial court in this post-conviction proceeding is therefore affirmed.

*Judgment affirmed.*